```
                    UNITED STATES DISTRICT COURT
                             FOR THE
                       DISTRICT OF VERMONT


JEANNE R. RANSOME f/k/a Jeanne R.   :
Smith                               :
        Plaintiff,                  :
                                    :
        v.                          :   Docket No. 2:04-CV-15
                                    :
METROPOLITAN LIFE INSURANCE         :
COMPANY                             :
        Defendant.                  :
```

Opinion and Order

This lawsuit involves a claim for benefits under a life insurance policy brought by a beneficiary after the death of the insured. Plaintiff Jeanne Ransome filed a Motion for Summary Judgment (Doc. 16) on October 4, 2004, asserting that Defendant Metropolitan Life Insurance Company's[1] ("MetLife") termination of the late Wallace Smith's group life insurance policy on November 17, 2000 was ineffective. Ransome claims that MetLife 1) was in violation of the statutory requirements governing the life insurance policy; 2) breached the insurance contract and that Smith was entitled to notice that he was in default prior to cancellation of the life insurance policy; 3) breached the implied covenant of good faith and fair dealing; 4) committed consumer fraud and; 5) violated the Vermont Consumer Fraud Act. Defendant MetLife responded with a cross-motion for summary judgment (Doc. 24). For the reasons that follow, Ransome's

---

[1] The parties agreed to substitute MetLife in place of MetLife, Inc. as the defendant in this suit. In January 2000, MetLife purchased General American from General American Holding Company. General American is a wholly-owned subsidiary of MetLife.

Motion for Summary Judgment is **denied** and MetLife's Cross-Motion for Summary Judgment is **granted**.

## Factual Background

The following facts are undisputed or presented in the light most favorable to the non-moving party. Smith was employed by A.G. Edwards, Inc. ("A.G. Edwards") as a stockbroker until April 1997. In May 1995, he obtained a group life insurance policy with General American Life Insurance Company ("General American") through his employer in the amount of $320,000, naming Ransome, his wife, as the beneficiary. When Smith terminated his employment with A.G. Edwards in April 1997, he elected to obtain supplemental group life insurance coverage from General American. In a May 15, 1997 letter to Smith from General American, General American notified Smith that if he did not pay his premium on time, his lack of payment would cause termination of coverage. (Doc. 26, Ex. B). In the Application for Continuation of Supplemental Life Insurance that Smith filled out on May 20, 1997, he was provided notice that the "required premium is due to General American within thirty-one (31) days following the notification date." (Doc. 26, Ex. E).

General American sent premium payment notices directly to Smith. Smith paid an administrative fee of $7.00, in addition to each quarterly premium. He received premium notices ten days before premiums were due for each quarterly bill. Payments were due on the first day of each quarter. General American notified Smith in premium notices that the policy would be automatically

terminated for non-payment if the premium was not received within thirty-one days of the due date.  (Doc. 26, Ex. F).  Individuals covered by the policy received a certificate of group insurance from General American, not a copy of the policy.

A. G. Edwards notified former employees, including Smith, in a November 3, 1999 letter that it would not offer "continuation coverage" under the group life policy and was offering "portable life benefits."  (Doc. 26, Ex. G).  Smith was advised in that same letter that his application must be post-marked no later than December 9, 1999.  Smith applied for the portable life benefits under the policy.

Smith missed the deadline for his insurance application for portable life benefits.  At the time the insurance application was due, he was in ill health, suffering from coronary artery disease.  Thus, Ransome, despite being separated from Smith, was taking care of his financial matters.  Smith was also living with Ransome.  Ransome forwarded Smith's application and the January 2000 premium payment after the December 9, 1999 due date. General American rejected Smith's application and returned Ransome's check because his application was post-marked after the December 9, 1999 deadline.  Ransome called General American and said that she had been confused about the application deadline, and General American accepted Smith's late application.  Ransome timely paid Smith's next quarterly premium, due on April 1, 2000. Ransome also cared for Smith after he had coronary artery bypass

surgery in March 2000.  In early September 2000, Smith moved out of Ransome's house and Smith's mail was being sent directly to his new address.

Ransome does not know whether Smith received an invoice for the premium payment due on October 1, 2000.  Smith never told Ransome that he did not receive an invoice for premium payment due on October 1, 2000.

Smith failed to make the October 1, 2000 premium payment.  On November 17, 2000, Smith received a letter from General American notifying him that his policy was terminated for nonpayment of premium.  Smith never contacted General American or MetLife after receiving the termination letter.

Ransome filed for divorce from Smith in November 2000.  Smith completed a financial affidavit in the divorce proceedings, in which he disclosed to Ransome that he had no life insurance coverage.  He also confirmed that fact in a conversation with Ransome in early 2001.  Neither Smith nor Ransome contacted General American or MetLife to complain about the termination.  Smith was aware of the rules governing his insurance policy and knew that he was required to pay the premium quarterly in order to maintain his life insurance policy.

Smith moved to Virginia in 2001.  His divorce from Ransome became final in October 2001.  The life insurance policy was not mentioned in the divorce decree.  Smith died on June 27, 2002.  Ransome filed suit in December 2003.

**Discussion**

I.  Legal Standard

Summary judgment may be granted when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The party moving for summary judgment may satisfy its burden by demonstrating "that there is an absence of evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); Fed. R. Civ. P. 56(e).  A plaintiff must proffer "concrete evidence from which a reasonable jury could return a verdict in its favor."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  A material fact is one that would "affect the outcome of the suit under the governing law."  Id. at 248.  A court must view the facts and the inferences to be drawn from those facts "'in the light most favorable to the party opposing the motion.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Id. (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).  "Where cross-motions for summary judgment are filed, a court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."  Boy Scouts of Am. v. Wyman, 335 F.3d 80, 88 (2d

Cir. 2003) (quoting Hotel Employees & Rest. Employees Union, Local 100 v. City of N.Y. Dep't of Parks & Recreation, 311 F.3d 534, 543 (2d Cir. 2002) (internal quotation marks omitted)).

II. Violation of Vermont Statute Governing Life Insurance Policies

Assuming, without deciding, that a statutory private right of action exists for a beneficiary, the Court must first examine whether Smith's life insurance policy was a group or life insurance policy.  Vermont statutory law has different notice requirements for group and individual life insurance policies. Ransome contends that Smith's life insurance policy was an individual life insurance policy and that the November 17, 2000 termination letter violated the requirements that Vermont law places on individual life insurance policies,[2] including providing advance written notice of termination.  MetLife claims that Smith's policy was a group life insurance policy and that no written notice of termination was required.

There is no direct evidence that Smith ever held an individual life insurance policy.  The record demonstrates that Smith's life insurance policy was a group life insurance policy

---

[2]For an individual life insurance policy, the insurer would be required to state the time and place of payments of premiums, provide information concerning the grace period of a minimum of thirty days during which the policy would continue in full force and detail a reinstatement provision that would address how the life insurance policy could be reinstated within a period of three years after lapsing for failure to pay premiums.  8 V.S.A. § 3731.

that he obtained while working at A.G. Edwards.  As a former employee of A.G. Edwards, Smith extended his policy by participating in the portable group life insurance program.  A May 15, 1997 letter to Smith from General American's Group Client Services referred to the Group ID number and told him to return his initial premium payment to continue his supplemental life insurance to General American's Group Client Services (Doc. 26, Ex. B).  General American notified Smith in a November 3, 1999 letter that effective on December 31, 1999, A.G. Edwards Continuation Policy would be changed because A.G. Edwards bought a product called portable life.  (Doc. 26, Ex. G).  The letter stated the following:

> With the Portable Life Plan you will have your own individual policy with a certificate.  The first year of the Portable Life plan (January 1, 2000 through December 31, 2000) will be at the A.G. Edwards group rates.

Id.  Although the letter referred to the Portable Life Plan having an individual policy, the subsequent communications between General American and Smith continued to refer to a Group ID number and General American continued to bill Smith at A.G. Edwards group rates until his policy lapsed due to non-payment of premium on November 17, 2000.  A copy of the insurance invoice dated June 14, 2000 requesting payment of $204.04 had a Group ID number and reminded Smith to include his group and account numbers on his check.  (Doc. 26, Ex. K).  The November 17, 2000

letter to Smith from General American notifying him that his benefits had been terminated was from General American Group Client Services and made reference to a Group ID number.  (Doc. 26, Ex L).  At the time the policy was terminated, General American was billing Smith at group rates.  Taking all these documents into consideration, it is clear that General American was treating Smith's policy as a group life insurance policy and was communicating this information unambiguously to him.

Vermont Statutes Annotated Title 8 §§ 3812, 3813 address the requirements for group life insurance policies.  An insured person with "[a] group life insurance policy is entitled to a grace period of thirty-one days for the payment of any premium due."  Vt. Stat. Ann. tit. 8 § 3813 (2001).  MetLife was only obligated to provide Smith with a grace period of thirty-one days before terminating the life insurance policy.  Id.  Thus, MetLife was in compliance with Vermont group life insurance law for cancellation of the group life insurance policy.

III.  Contract Issues

    A.  Breach of Contract

Ransome claims that there was a contract between General American and Smith to send out a premium notice for the quarterly bill for the premium due and that General American breached that contract by not providing Smith with notice for his premium payment due in October 2000.  Ransome seeks damages for breach of

contract.  MetLife contends that the insurer had no contractual obligation to send Smith a billing notice or invoice.

The court need not decide whether there was a contract, due performance of the contract, breach of the contract and resulting damages because assuming that these elements could be found in Ransome's favor, she and Smith unreasonably delayed in pursuing this action.  The steps to reinstate the policy must be taken within a reasonable period of time to determine the "extent of any rights they might have had thereunder."  Hebert v. Jarvis & Rice & White Ins., Inc., 134 Vt. 472, 477, 365 A.2d 271, 274 (1976) (addressing plaintiff's estoppel argument in an insurance dispute).  "When the facts [as to timing] are undisputed . . . reasonable time is a question of law."  Emerson v. Hughes, 117 Vt. 270, 277, 90 A.2d 910, 914 (1952).  Other courts, outside Vermont, have recognized that a party making an insurance claim lost his or her right by inaction or unreasonable delay.  See Chemical Bank v. Affiliated FM Ins. Co., 169 F.3d 121 (2d Cir. 1999);[3]  Bezanson v. Metropo. Ins. and Annuity Co., 952 F.2d 1, 6

---

[3]In Chemical Bank, a party's unreasonable delay in challenging the validity of the insurer's cancellation prevented that party from recovering the policy benefits.
    The Banks received notice on March 11, 1986, that the Affiliated Policy had been terminated on February 25, 1986.  Although this notice would surely have caught the attention of any insured who needed prior warning-- and prompted a swift protest--the Banks never objected to or questioned the validity of the termination, at least until they discovered years later that it was in their litigation interests to do so. Under the circumstances, the Banks' silence in the face of this

(1st Cir. 1991) (applying Maine law, where unreasonable delay precluded the insured from recovery and the court recognized that "no law anywhere supporting the position that failure to send a required notice of lapse will extend the coverage of any policy indefinitely . . . but surely it would be extraordinary to say that he (the policy owner) gets a free ride and retroactive choice forever; there must be a limit of reasonableness."); Norwest Bank, N.A. v. Federal Kemper Life Ins. Co., 110 F. Supp. 2d 774, 785 (N.D. Ind. 2000) (Norwest was an assignee that may have contractually been entitled to premium and lapse notices, however summary judgment was entered against Norwest because it unreasonably delayed having the policy reinstated).

Smith could have challenged the termination of his life insurance policy from the date that he received written notification of termination on November 17, 2000 until his death on June 27, 2002.  Instead, he never attempted to get his life insurance policy reinstated.  Ransome was notified that Smith had no life insurance policy in early 2001, during her divorce proceedings.  Ransome also made no effort to contact MetLife after she learned that Smith had no life insurance in 2001.  In this particular instance, a reasonable time period to challenge

---

cancellation notice amounted to an implied affirmance of the cancellation on February 25, 1986. Chemical Bank v. Affiliated FM Ins. Co., 169 F.3d 121, 128 (2d Cir. 1999), on reh'g at, 196 F.3d 373 (2d Cir. 1999) (although the Chemical Bank decisions were vacated, this particular point of law has not been questioned, and the basis for the decisions being vacated was unrelated to this point of law).

the termination of Smith's life insurance policy ended with Smith's death. To allow an unlimited time for Ransome, as the beneficiary, to challenge the termination of Smith's life insurance policy would be prejudicial to Metlife because a beneficiary could then wait for an indefinite period of time without payment of premiums. As such, the unreasonable delay on the part of Smith and Ransome prevents recovery of damages in this matter.

B.  Custom or Notice

Alternatively, Ransome claims that Smith had a right to receive notice that payment was due prior to having his policy cancelled because the insurance company had established a custom or practice of giving notice of premiums due. An insurance company generally has no custom-based obligation to give notice. "The reason why the insurance company gives notice to its members of the time of payment of premium is to aid their memory and to stimulate them to prompt payment. The company is under no obligation to give such notice, and assumes no responsibility by giving it." Thompson v. Knickerbocker Life Ins. Co., 104 U.S. 252, 258-59 (1881); see also Peterson v. State Auto. Ins. Ass'n, 70 N.W.2d 489, 494 (Neb. 1955) (citing Thompson and noting that the custom of insurance companies giving notice of premium payments does not bind them contractually to continue to do so and this notice does not alter the duty of the insured to pay, whether he gets notice or not). However, when an insurer has the

11

practice of giving notice of payments for a length of time that leads "the insured to believe notice will be given, the insurer cannot declare a forfeiture without giving notice, or without previously advising the persons who have relied upon receiving notice that the custom will be or has been discontinued." Couch § 71:7 (2004).

Ransome cites Carfagnini v. Service Life Ins. Co., 274 A.2d 303, 305 (N.J. Super. A.D. 1971) in support of her position. According to Carfagnini, a plaintiff's "reliance constitutes an estoppel against the company's forfeiture of his policy." Id. (noting that "insurer cannot declare a forfeiture for nonpayment of premium if such nonpayment is attributable to the insurer's failure to provide the notice"). The elements of equitable estoppel are:

> (1) [t]he party to be estopped must know the facts;
> (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended;
> (3) the latter must be ignorant of the true facts; *and*
> (4) he must rely on the former's conduct to his injury.

In re McDonald's Corp., 146 Vt. 380, 383-384, 505 A.2d 1202, 1204 (1985). "Equitable estoppel operates to prevent a party from asserting rights which may have existed against another party who in good faith has changed his or her position in reliance upon earlier representations." Mellin v. Flood Brook Union School Dist., 173 Vt. 202, 222, 790 A.2d 408, 425 (2001) (quotation marks and citation omitted). A plaintiff who was aware of the

existence of the insurance policies, yet did not take any steps within a reasonable time period to determine the extent of his rights, cannot show detrimental reliance.  Hebert, 134 Vt. at 477, 365 A.2d at 274.  In other words, estoppel is not available to a party who unreasonably delays in seeking to protect his or her rights.  Here, there was an unreasonable delay by Ransome and Smith in contacting MetLife after Smith received his termination letter so that equitable estoppel is unavailable.

IV.  Breach of Implied Covenant of Good Faith

Ransome also alleges that there was a breach of the implied covenant of good faith and fair dealing by not performing services in a professional manner or consistent with the requests or expectations of Smith or Ransome.  Under Vermont law, "there is an implied covenant of good faith and fair dealing is part of every contract; that is, 'each party promises not to do anything to undermine or destroy the other's rights to receive the benefits of the agreement.'"  Howard Opera House Assoc. v. Urban Outfitters, Inc., 166 F. Supp. 2d 917, 933 (D. Vt. 2001) (citing Carmichael v. Adirondack Bottled Gas Corp. of Vt., 161 Vt. 200, 208, 635 A.2d 1211, 1216 (1993)).  The implied covenant exists to make sure that parties to a contract act with "'faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.'"  Id. (quoting Restatement (Second) of Contracts § 205 cmt. a (1981)).  Summary judgment

will be granted on a breach of the implied covenant of good faith claim where the nonmoving party cannot show how the other undermined or destroyed its rights under the contract.  See Lauzon v. State Farm Mut. Auto. Ins. Co., 164 Vt. 620, 621-22, 674 A.2d 1246, 1247 (1995) (entry order).  There is no evidence that MetLife undermined or destroyed Smith's rights and therefore summary judgment is granted on this claim.

V.   Actual Fraud

Ransome's motions never directly address the actual fraud claim.  In the complaint, Ransome asserts that MetLife engaged in fraudulent activities in connection with the cancellation of the policy because "General American may have intentionally failed to send out an invoice in September [2000] in the hopes that Mr. Smith would forget to make a payment" because General American may have wanted to terminate Smith's policy after it learned of his bypass surgery.  Compl. ¶ 39.  MetLife contends that Ransome failed to raise any genuine issue with respect to her actual fraud claim.  "Under Vermont law, fraud must 'consist of some affirmative act, or of concealment of facts by one with knowledge and a duty to disclose.'"  Sugarline Assoc. v. Alpen Assoc., 155 Vt. 437, 444, 586 A.2d 1115, 1119 (1990) (quoting Standard Packaging Corp. v. Julian Goodrich Architects, Inc., 136 Vt. 376, 381, 392 A.2d 402, 404 (1978)).  "'Actual fraud' is deceitful misrepresentation or concealment with evil intent."  Proctor Trust Co. v. Upper Valley Press, Inc., 137 Vt. 346, 354, 405 A.2d

14

1221, 1226 (1979) (citation omitted).  There is insufficient evidence from which a reasonable juror could decide that MetLife intentionally failed to send out an invoice in September 2000 with the intent to cause Smith to lose his coverage.

VI.  Vermont Consumer Fraud Act

Ransome also alleges that MetLife violated the Vermont Consumer Fraud Act by engaging in unfair or deceptive trade practices by misleading Smith about his rights to reinstate his policy after receiving the November 17, 2000 termination letter. To fall within the scope of the Vermont Consumer Fraud Act, the "unfair methods of competition" or "unfair or deceptive acts or practices" must occur "in commerce."  Vt. Stat. Ann. tit. 9 § 2453(a) (1993).

If the Vermont Consumer Fraud Act was applicable to insurance contracts, there is no evidence that anyone at MetLife engaged in deceptive practices by making fraudulent misrepresentations to Smith.  The November 17, 2000 letter to Smith from General American informed him that his policy had been cancelled because of nonpayment of premium.  The letter also provided that "if your records show that the payment has been forwarded, please contact us immediately."  (Paper 26, Ex. L). The letter does not mislead Smith about his rights.  Ransome fails to identify any other deceptive acts that form the basis of a consumer fraud claim.  Therefore, summary judgement is ordered in MetLife's favor.

**Conclusion**

For the foregoing reasons, Plaintiff's Motion for Summary Judgment is **denied** and Defendant's Cross-Motion for Summary Judgment is **granted**.

Dated at Burlington, Vermont this 22nd day of August, 2005.

<u>/s/ William K. Sessions III</u>
William K. Sessions III
Chief Judge, U.S. District